### FOSTER

#### v.

### CARTER CARBURETOR CORP.

Nos. 28809, 28845.

St. Louis Court of Appeals.

Missouri.

Feb. 16, 1954.

Not to be reported in State Reports.

Wm. R. Gentry and William A. Dorsey, St. Louis, for appellant.

Abraham Altman and William R. Kirby, St. Louis, for respondent.

HOUSER, Commissioner.

In this workmen's compensation proceeding a referee of the division of workmen's compensation denied the claim of Helen Loman Foster, employee, and found in favor of Carter Carburetor Corporation, employer. On review the industrial commission affirmed the award of the referee denying compensation and found that the condition complained of by claimant "is not the result of an accident arising out of and in the course of her employment with the Carter Carburetor Corporation." On appeal the circuit court reversed the final award of the industrial commission and remanded the cause to the commission. From the judgment of the circuit court the employer has appealed to this court.

In her claim Helen Loman Foster alleged that on April 24, 1951 when she was lifting a pan of parts to be placed upon a table for assembling the pan slipped and threw her against a machine, thereby injuring her. The employer, a self-insurer, filed an answer consisting of a general denial.

Claimant, an assembler or bench hand, operated an electric screw driver in the jet department of a carburetor factory. The machine was mounted on a bench about 3 feet above floor level, and was located next to an aisle. That machine and two other similar machines were mounted in a row on the bench or table. Claimant's job was to assemble parts which were brought into the assembling room in metal

pans or trays. The trays were deposited on the floor some 15 feet from claimant's working position. They varied in weight from 69 to 89 pounds. The operator dragged the trays along the floor to the table by means of a hook, then "had to lift them up on the table." During a part of the time there were two stock boys on the premises who, when they "happened to be around" and could be found, were available to lift the trays to the table for the assemblers. If the boys were not available the assemblers themselves would lift the trays. Sometimes the operators helped each other lift the trays. On the day in question claimant lifted all of the trays by herself, without help from anyone, as she had done on previous days. She had been operating the particular machine for a week or 10 days prior to April 24, 1951.

In support of her claim that an "accident" occurred the sole evidence offered by claimant was her own uncorroborated testimony as follows: Between 11:35 and 11:40 o'clock p. m. claimant started to lift a tray or pan of parts from the floor to the table. She lifted the pan right straight up from the floor, in just the same way that she had lifted pans during the previous week or 10 days. It was "a little heavier than it looked," and when she had raised the pan about 2½ feet from the floor it tilted forward and threw her against the table. Her right side struck against the table. When her right side hit against the table and just before she had gotten the pan to the top of the table she felt a pain, a tear and stinging sensation in her right side and a snap in her back. The pan of parts fell against and onto the table and some of the parts fell out of the pan. Claimant became nauseated and vomited at the time, right there at her bench. There was no operator at the next machine but there was a girl operator at the second machine from claimant's. That operator saw claimant vomit at that time. Claimant told that girl about the accident. She and claimant "very freely" discussed the accident, the vomiting and the pain in her side. Claimant said nothing to any other employee except this one girl. She did not report it to Evelyn Garvey, her floor lady. The accident occurred about 20 minutes before the end of claimant's shift. Claimant wiped off her machine but did no more work until quitting time, when she went home by taxi and went to bed. Her side, back, leg and hip, all on the right side, hurt and she had chills and vomited from time to time all through the night. The next day at her regular working hour she went directly to the plant hospital and reported to the nurse, complaining of severe pains in her side, back, leg and hip. The nurse gave her some pills and told her to go home and rest that night and the next day. At that time claimant told her that she "got hurt" the night before; that she was lifting a pan when it tilted and threw her against the table. Claimant then went home and went to bed, but she saw Dr. James Austin on April 25. When she went to see Dr. Austin her right hip and leg were swollen and she had some blue marks on her right hip about 6 inches below the waist line in the vicinity of the hip bone. Claimant related the facts surrounding the accident, the tilting of the pan, falling against the bench, etc., to her doctor.

Following Dr. Austin's examination and on his orders she went back to bed. On April 26 Dr. Austin sent her to Dr. James Meador. On April 28 she entered Missouri Baptist Hospital. There she underwent an abdominal operation, and was finally discharged on May 16, 1951. Post operative diathermy treatments continued for 6 or 8 weeks. Claimant testified concerning the pain that she had suffered and was suffering, related her sensations of numbness and tingling and told about her present disability. After she left the hospital and returned to her home one of the company nurses called on her on several occasions. She says that she complained to the nurse about her back and that her husband told the nurse that her condition was due to the accident she had.

Two doctors testified that claimant had a 40% permanent partial disability of the

whole body and one of them testified that she was incapacitated for all work. Drs. James Austin, Harry Thieme and Francis M. Barnes, Jr., in answer to hypothetical questions, testified that the sensory, abdominal and back condition (intervertebral disc injury) they found were due to the incident of picking up the pan when the pan tilted, throwing claimant against the table.

The theory of the defense was that no accident happened—that there was no connection between claimant's working conditions and her physical condition. In support of this theory employer introduced the testimony of Evelyn Garvey, claimant's supervisor, whose duties took her into that area of the factory in which claimant worked at the time the accident was supposed to have happened, and that of two assemblers on the same shift, who claimed that they were working alongside claimant at the time of the alleged accident. Frieda Meyer talked to claimant near quitting time. Irene Wierschen worked at the machine next to claimant. They had no recollection of claimant vomiting, did not see her vomit, or hear her say that she had vomited. They did not know of anyone who did see her do so. Claimant did not report any accident to her supervisor or state to either of her coworkers that she had been injured or hurt. They did not recollect any unusual occurrence near quitting time on the night in question. Irene Wierschen testified that near the end of the shift she saw claimant in line "to ring out her time card," at 5 minutes before 12 o'clock, which was some 15 or 20 minutes after the accident is supposed to have happened. At that time there was nothing unusual about claimant's appearance. She looked no different from any time during the previous part of the shift. Hattie Canedy, the nurse to whom claimant reported the next day, testified that she took down her complaints of severe pain in the abdomen and right leg; that although claimant related that the pain commenced at 11:40 o'clock the night before while "lifting a pan from the floor to the table," claimant

did not make any statement to the effect that the pan *had slipped.* She examined claimant's abdomen but found no evidence of any bruises or contusions on the abdomen or the right side. Lydia V. Dunne, superintendent of nurses for employer, visited claimant personally on April 25, 1951 at the hospital. Claimant told her that she was lifting a pan and as she lifted it she felt this catch or whatever it was in her abdomen, but she did not tell her about the pan slipping or tilting. William A. Dorsey, attorney and investigator for employer, testified that he interviewed claimant at the Missouri Baptist Hospital on May 7, 1951, and after spending an hour and a half talking to her and making notes, he reduced to writing what she told him. About the time the statement was completed a man, whom he later learned was claimant's husband, came into the room. Claimant introduced him to Mr. Dorsey as her "boy friend." In the presence of her husband and Mr. Dorsey, who submitted the statement to both of them to read, claimant signed her name on each of the five pages of the statement after both claimant and her husband had read it, and after claimant had acknowledged that the statement was a true and correct account of what had happened. In that statement claimant said, in part:

"On this particular day, April 24, 1951, about 11:35 P. M., I lifted a pan of these parts from the floor to the bench. I was lifting the pan straight up from the floor and when I had the pan about 12 inches from the floor I felt a pain in my right lower abdomen that felt like something tore loose. I completed lifting the pan up on the bench, but after I had raised it above the level of the bench, I let the pan fall down onto the bench. At the time I was lifting this particular pan I was lifting it in exactly the same way as I had been lifting and handling these pans for the previous seven days, and at the time I was lifting this particular pan I did not slip or fall or stumble and nothing unusual happened except that when I lifted this particular

pan I felt this pain in my right lower abdomen. I am unable to account for the reason that I had this pain while lifting this particular pan when I did not have any pain while lifting other pans on this job, all of which were lifted exactly the same way and all of which weighed the same amount."

Nowhere in the Missouri Baptist Hospital record was there any account or statement by claimant that she had met with such an accident as she now claims to have suffered. The records of the employer's hospital, to which employees who were sick or injured reported, showed that prior to the date of the alleged accident claimant appeared at the hospital and made complaint on at least 76 separate occasions. Her physical complaints through the years included backaches, headaches and stomach trouble for which she was given prescriptions on numerous occasions. On January 8, 9, 23, 24, 1951 she complained of nausea, vomiting and nervousness and was given prescriptions for her stomach, nerves and headache. On March 5, 1951 she received a prescription for her stomach; on March 13, 1951 for indigestion; on March 14, 1951 for pains in the pit of her stomach; on April 16 and 17, 1951 she was given prescriptions for abdominal cramps and stomach trouble. Coworkers testified that claimant was always complaining about various ailments, and it was her common complaint that her legs or back hurt. She told Verna Frisch on one occasion that she had a vertebra out of place. The record entry of April 25, 1951 did not relate any history of accident or unusual occurrence. It follows:

"April 25, 1951, 3:50 p. m., complaining of severe pain in the right side of abdomen and down the right leg. First noticed it as she was lifting a pan of parts, on April 24th, of 1951, at 11:40 p. m. Felt tearing sensation. Will not work tonight."

Claimant's operating surgeon, Dr. James R. Meador, testified for the employer that claimant gave "a history of lifting and having pain in the right lower abdomen." In the operation he opened the abdomen and freed "a lot of" abdominal adhesions, most of which were old adhesions. There was evidence that claimant had an abdominal operation in 1940 at which time a hysterectomy and an appendectomy were performed on her. Claimant's acute condition on April 24, 1951, according to Dr. Meador, could have been caused without any exciting factor outside of the normal functioning of the body, such as stooping or bending, or any movement of the body. It could have occurred while the woman was lying in bed. He made no note of any marks or abrasions on her hips. Dr. Thieme testified that sneezing and coughing could bring about injury to the intervertebral disc if a person sneezes hard enough, and that lifting a 65 pound pan up from the floor raising it straight could cause the pains in her abdomen and back. Dr. Austin testified that, assuming claimant was lifting up the pan and had gotten it 2 feet or so off the floor, she could have had a tear or rupture of adhesions when she was raising the pan of parts, "on those facts alone." He did not remember any signs of black and blue spots on her right hip when he examined her. He found no discoloration that he recalled. When he finds bruises or discolorations he makes a notation of the fact, and he made no such notations in this case. Dr. Francis M. Barnes, Jr., testified that the lifting of the pan (the tilting and trauma were omitted from the hypothetical question) might have caused the adhesions to tear in her abdomen. Dr. Archie D. Carr found no evidence of organic disease of the nervous system or of any lesion of an intervertebral disc.

Discrepancies and contradictions to be found in the testimony of claimant include the following: Claimant testified that between October 2, 1939 and April 24, 1951 she did not have any pain or discomfort in her back, whereas the plant hospital records and her coworkers indicated that she made numerous complaints about backache during that period; that she told the girl at the second machine from claimant

about the accident, and that she saw claimant vomit, but this was denied by Irene Wierschen, who testified that she was working next to her at the time in question, and by Frieda Meyer, who was working at the second machine from claimant; that between October 26, 1940 and April 24, 1951 she was not under the care of any doctor for any reason but later was forced to admit that she had consulted numerous doctors during that period; that she had only had two operations in her lifetime but later admitted that she had had three operations. She testified untruthfully about her first employment. There was considerable discrepancy between the testimony given by claimant in a deposition and at the hearing with respect to the places of her employment. Her only explanation was that she was confused in giving the testimony at the deposition. Irene Wierschen testified that claimant told her that she had lived in an 8-room houseboat in Alaska, and claimant told Verna Frisch that she had lived in Alaska, but claimant herself testified that she had never lived in Alaska.

On this appeal appellant contends that the circuit court erred in reversing the award of the industrial commission for the reason that there was no "accident" within the meaning of the term as used in the Act; that claimant's version of what happened at the time and place in question is untrue; that the commission is the fact-finding body under the law; that there was abundant substantial evidence to support the finding of the referee and commission denying compensation, and that the circuit and appellate courts are bound by the commission's finding.

■ The truth or falsity of claimant's testimony—the credibility of claimant as a witness—was the ultimate decisive factor. The agency which by law is charged with the duty of finding and determining the facts and which is empowered to weigh the evidence in this type of case is the industrial commission. Acting in the first instance through its referee and thereafter on review in its full capacity the commission had the right and duty to pass upon the credibility of claimant as a witness and could disregard and disbelieve her testimony if in its judgment that testimony was not credible, even though there was no countervailing evidence to contradict or impeach it. Long v. Mississippi Lime Co., Mo.App., 257 S.W.2d 167, and cases cited loc. cit. 170. As a reviewing court we cannot substitute our judgment for that of the commission in this regard, but must sustain the award of the commission unless it clearly appears that the commission could not reasonably have made its finding, Sams v. Hayes Adhesive Co., Mo.App., 260 S.W.2d 815,—unless it is not reasonably supported by competent and substantial evidence—or is clearly contrary to the overwhelming weight of the evidence. Wood v. Wagner Elec. Corp., 355 Mo. 670, 197 S.W.2d 647; Powers v. Universal Atlas Cement Co., Mo.App., 261 S.W.2d 512.

■ Under this record it is apparent that the finding of the commission is supported by competent and substantial evidence; that it was a reasonable result for the commission to reach, and that it is not contrary to the overwhelming weight of the evidence. Claimant related a set of facts which normally would attract attention: an employee falling against a bench, a heavy tray falling and spilling out a part of its contents, and an employee vomiting at her bench. Closely placed coworkers, however, noticed no such an occurrence and say that nothing unusual happened. Claimant says that she told her fellow worker about the occurrence, but the fellow worker denies this. Claimant customarily and frequently reported much less severe ailments to the plant hospital, but on that shift made no report, either to her supervisor or to the hospital, of the happening of an incident such as the one on which she now depends. Instead of exhibiting pain and weakness a few minutes after the alleged occurrence, she appeared normal. Claimant says that she sustained hip bruises as a result of the fall, but strangely enough she did not show the bruises to two doctors and two nurses who

saw and examined her within 48 hours. Neither her coworkers, the doctors, the hospital records, nor subsequent reports of the facts by claimant to claim agents reveal that claimant related a history of an unusual accidental occurrence. Claimant's testimony is full of inconsistencies and discrepancies. On various matters she conceded that she did not tell the truth. Much of the medical evidence is wholly consistent with the theory that the old operative adhesions were torn by the mere act of lifting the pan, without the occurrence of any tilting or trauma. Claimant's story that only she and one other worker were on duty on that shift at her bench conflicts with the evidence given by Frieda Meyer and Irene Wierschen that they and claimant (i. e. three operators) worked that shift at that bench. The fact that both Frieda Meyer and Irene Wierschen worked that shift with claimant was corroborated by documentary evidence in the form of time cards. Claimant relied solely upon her own credit as a witness and testified to facts which in all likelihood did not occur if the other witnesses are to be believed. From the record, taken as a whole, any fact-finding body might well conclude that there was no tilting of the pan, trauma to claimant's body, or unusual occurrence at the time and place in question. The award of the referee and of the full commission denying compensation is not against the overwhelming weight of the evidence and we cannot say that the award of the commission is not supported by substantial evidence on the whole record. The circuit court, therefore, had no basis for disturbing the commission's award. Garbo v. P. M. Bruner Granitoid Co., Mo.App., 249 S.W.2d 477.

In her brief respondent asks for a review of the findings of fact and rulings of law made by the referee, taking exception to the sufficiency of the evidence to sustain his findings in four particular instances, and attacking the validity of his conclusions of law. It is to be observed that the final award of the full commission denying compensation, while affirming the award of the referee, did not adopt the referee's findings of fact and rulings of law, nor did the full commission, on review, make its own findings of fact and conclusions of law. We therefore find no occasion to review the findings of fact and conclusions of law of the referee, for the reason that it is the award of the commission that is now before us for review, and not the award of the referee. The latter, having been supplanted by the award of the commission, serves no further purpose in the case except that, as a part of the record, it is a factor to be considered in determining whether the award of the commission was supported by competent and substantial evidence upon the record as a whole. Michler v. Krey Packing Co., Mo.Sup., 253 S.W.2d 136; Clark v. Frazier-Davis Const. Co., Mo.App., 258 S.W.2d 934.

This conclusion makes it unnecessary to decide the question of whether, even if claimant's version of the facts had been believed, they would have shown an "accident" within the meaning of the Act.

The circuit court erred in reversing the award of the commission. The judgment of the circuit court should be reversed and the cause remanded with directions to the trial court to enter a new judgment affirming the award of the industrial commission, and the Commissioner so recommends.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, reversed and the cause remanded with directions to the trial court to enter a new judgment affirming the award of the industrial commission.

ANDERSON, P. J., BENNICK, J., and LAWRENCE HOLMAN, Special Judge, concur.