Mildred BANKS, Carma Sue Banks, Jessie Juanita Banks, Samuel P. Banks, Jr., and Mildred Arline Banks, Dependents of Sam P. Banks (Deceased), Employee, (Plaintiffs) Appellants,

v.

CITY OF HANNIBAL, Missouri, (Board of Public Works), Employer and Self-Insurer, (Defendant) Respondent.

No. 28975.

St. Louis Court of Appeals. Missouri.

Nov. 15, 1955.

Roy Hamlin, Hannibal, for appellants.

Dennis Davidson, City Atty., Fuller, Ely & Hibbard, Hannibal, for respondent.

ANDERSON, Presiding Judge.

This is a proceeding under the Workmen's Compensation Act, Sections 287.010–287.800 RSMo 1949, V.A.M.S. The appeal is by plaintiffs from a judgment of the circuit court affirming an award of the Industrial Commission which denied compensation to the employee, Sam P. Banks. The employer was the City of Hannibal. Subsequent to the entry of the award, and while said cause was pending on appeal to the circuit court, the employee died. Thereafter, his widow, Mildred Banks, and his minor children, Carma Sue Banks, Jessie Juanita Banks, Samuel P. Banks, Jr., and Mildred Arline Banks, were substituted as parties plaintiff.

The claim for compensation alleged an injury to claimant's right leg on August 16, 1950, as the result of a fall. It was further alleged that said injury caused a blood clot to form in said leg, with the result that claimant's leg had to be amputated.

By its answer, the employer denied that claimant suffered an accident or received any injury as the result of an accident within the meaning of the Compensation Act.

There was a hearing before a referee of the Commission which resulted in an award in favor of the employee for permanent partial disability in the sum of $25 per week for 160 weeks, and the sum of $659 for medical aid and hospital expense. The Commission in reversing this award found that the condition complained of by said employee was neither caused nor aggravated by an accident arising out of and in the course of his employment.

The sole question before us is whether the Commission could have reasonably made its finding upon consideration of all the evidence before it.

Claimant at the time of the hearing was fifty-one years of age, and on August 16, 1950, and for some time prior thereto, was employed by the defendant city at the filtration plant of its municipal waterworks. Claimant worked a night shift, going on duty at twelve o'clock midnight and being relieved at eight o'clock in the morning. He worked alone. In the plant were certain hoppers containing lime, alum, and ammonia. It was claimant's duty to keep these hoppers filled. The lime was kept in paper sacks weighing about fifty pounds. To fill a hopper claimant was required to go up three steps, then pour the contents of the sack into the hopper. Claimant's testimony concerning his alleged accident is as follows:

"A. Well, I just picked up a sack of lime and started to go up these steps, up to the hopper with it, and just as I started to step up the first step of the three steps, I believe there was, maybe four, my foot slipped, and I had the sack of lime in my arms, and my foot, right foot, slipped under the steel steps,

and I fell backwards, * * * clear on down to the floor.

"Q. * * * what part of your foot or leg was injured or hit? A. It was about two inches above my ankle, on my right leg. * * * I just got up and rubbed it a little bit and walked on away. * * * It hurt pretty bad there for a while, then I walked on away and went on to my work and finished my work, and as soon as my relief man came I went on home, and by the time I had gone home, it had got pretty bad."

Claimant first fixed the date of the accident as August 18th, but during the course of the trial, and after his physician, Dr. Sultzman, had testified that he treated claimant on the 16th, the latter amended his claim to conform to the doctor's testimony. Claimant testified that on that occasion he told Dr. Sultzman that he had slipped and bumped his leg in the feeder room at the filtration plant.

Dr. Francis E. Sultzman, who was defendant's witness, testified as follows:

"Q. And on the occasion of August 16, 1950, what was his complaint when he came to your office? A. His right leg was cold and painful for the past several weeks. He had a fracture of the right second toe that had happened about three weeks previously at home. * * * That was the history that was given me, he had bumped, hit the right instep against a car, which was followed with localized edema and ecchymosis. That means swelling and discoloration. * * * He was convalescent from this. * * * On the 20th of August, 1950, he developed a severe pain in the right calf with evidence of thrombosis, which is clotting. A clotting of the vessels behind the right knee, and of course, with the history of diabetes for 30 years, he was referred to the hospital. * * * My records do not indicate any evidence of trauma at that time.

"Q. Did the patient state to you on the 20th anything about another, an additional accident that he had suffered after he had seen you on the 16th? A. I have no record of him having said that, if he did, I have no record of it. * * * I have no record of any accident between the 16th and the 20th. * * * The next note on his record is August 24, 1950. He was still a patient at St. Elizabeth's Hospital. He required sedatives for pain, diabetes stabilized with insulin, and he was on 80 carbohydrates, 90 protein and 80 fat diet. On the 7th of September he was having a relapse of severe pain, and on the 8th of September, beginning again, in the right third and fourth toe. On the 15th of September progressive spreading gangrene, the toes of the right foot, especially the third and fourth, extending up over the instep, with severe pain. Amputation of leg above knee advised. Thrombosis in the popliteal space. Diabetes had stabilized for the past four days with diet and insulin, and on that date, his right leg was amputated, approximately four centimeters above the knee."

Claimant denied that he told Dr. Sultzman that he had an accident at home two weeks before consulting him on August 16th.

Claimant had on prior occasions been treated by Dr. Sultzman. The latter testified that he first saw claimant in February, 1945, at which time he treated claimant for a compressed fracture of the left toe. An examination of claimant's general condition was made at that time, during the course of which it was discovered that claimant was suffering from diabetes. The doctor stated that claimant told him he had sugar in his urine since he was about twenty years of age. Claimant denied making such statement. The toe condition healed satisfactorily and claimant was discharged as of March 8, 1945. Dr. Sultzman further testified that his record revealed that the patient was at that time warned about the dangers of diabetes. Claimant did not thereafter

report to the doctor for diabetic treatment. However, he was at the time put on a low carbohydrate diet.

Claimant next reported to Dr. Sultzman in December, 1949, for treatment of a burn on his second and third fingers which he had received a week previous while working at the filtration plant. Dr. Sultzman testified: "Sam was warned about the question of diabetes, and this condition, his burns, healed satisfactorily, and he was discharged on January 6, 1950." Dr. Sultzman did not treat claimant for diabetes after that time.

Dr. Sultzman stated he did not make a test of claimant's urine at the time claimant consulted him on August 16, 1950, but said he instructed claimant with reference to his diabetic condition, and warned him to avoid alcohol. He was also given medicine to help his circulation and was instructed to take vitamins daily.

Claimant denied that Dr. Sultzman ever told him prior to the entry into the hospital that he was suffering from diabetes. He stated that the doctor at no time advised him that he should be careful of his diet and avoid drinking alcohol, or that he should refrain from eating certain kinds of food. He said he never at any time had his urine examined by the doctor.

Claimant was released from the hospital on October 10, 1950. Dr. Sultzman testified that he saw claimant almost every day at the hospital. He also gave the following testimony:

"Q. Now, did he, at any time, during that period, ever state anything to you at all about having had an accident up at the city filtration plant, which accident was supposed to have taken place after the 16th of August? A. I have no way of saying that he didn't tell me, but I have no evidence on my record that he did.

"Q. And you have no recollection of it? A. No, I have no recollection of any such statement."

Dr. Sultzman further testified:

"It's a well established medical fact that injuries, illness, don't do well in the face of a diabetic condition * * * an injury doesn't aggravate the diabetes, but the diabetes does make the injury more difficult to treat unless you got the diabetes stabilized. * * * They are warned by pamphlets, they are warned by conversation to avoid trauma to their feet * * * because the feet, the extremities don't do well, they are hampered in that the circulation is interfered with, because diabetes has a tendency to produce a disease of the blood vessels, and circulation is not adequate."

Claimant testified that on the morning of his injury he was relieved at work by Otis McGee. He stated that he did not say anything to McGee about having had an accident at work that morning. According to the testimony of Roger Higgins, the last time McGee relieved claimant at work was on August 14th. He stated that McGee went on vacation the next day, that is, the 15th of August. Mr. Roger Higgins was claimant's superior. Claimant testified that he did not at any time see Mr. Higgins after the accident and before he went to the hospital. Higgins testified that he himself worked at the plant on the 17th, in place of Watts, and was relieved by claimant that night. Claimant made no attempt to call Higgins or tell him anything about his alleged accident. Claimant testified that he relieved Watts that night but did not think he told Watts anything about the accident. Claimant worked two nights subsequent to August 16th. The first night he took his cousin with him to do his work. Claimant further testified that he never did tell anyone connected with the city or its water department about his accident, except Mr. Watson. Mr. Watson was Superintendent of Public Works and, according to claimant's testimony, came to the hospital to see claimant on September 1st, at which time he told Watson how the accident happened. Claimant further stated that Mr. Watson said for him "to take it easy, that he'd see that I got my check and be taken care of."

Later, after claimant left the hospital he went to see Watson at the City Hall and asked about his job. Watson told him, according to claimant's testimony, "not to worry, he was going to take care of this whole thing, and he'd see that I got my job back when I was able to go to work. * * * He said he'd see I got my checks." Mr. Watson was dead at the time of the trial below.

Claimant was paid $90 twice a month for his services. He received his regular pay check up to and including October 31, 1950. On November 15th he received a check for $45, and a check for a like amount on December 15th and December 31st.

Roger Higgins, who was a chemist for the Board of Public Works and supervisor of the filtration plant, testified that it was the "policy of the city to pay employees for a certain length of time, depending on the merits," when they were off duty due to illness or otherwise.

Cyrus Watts and Roger Higgins both testified that claimant made no mention to them of having hurt himself at the filtration plant.

In appellants' brief, under the heading and caption "Points and Authorities," it is asserted that "The Court erred in sustaining the findings of the Industrial Commission because there was ample and sufficient evidence to affirm the award of the Referee." The point urged cannot be sustained.

█ Under the controlling authorities we are not authorized to reverse the award of the commission on the ground relied upon. Our duty is not to determine whether the award of the referee finds support in the evidence, but, rather, to ascertain if the award of the commission itself is supported by competent and substantial evidence upon the whole record. It is the award of the commission that is reviewed by the courts, and not the award of the referee. Art. V, Sec. 22, Constitution of Missouri, V.A.M.S.; Section 287.490 RSMo 1949, V.A.M.S.; Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W.2d 647; Seabaugh's Depend-

ents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55; Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W.2d 136; Ossery v. Burger-Baird Engraving Co., Mo.Sup., 256 S.W.2d 805; Hammett v. Nooter Corp., Mo.App., 264 S.W.2d 915. The finding of the referee is of importance only in so far as, being a part of the record, it should be considered together with all the other facts and circumstances disclosed by the record in determining whether the award of the commission should stand. Findings of the referee carry considerable weight, especially where there is a question as to the credibility of witnesses, but the referee's findings are by no means conclusive. Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W.2d 136; Ossery v. Burger-Baird Engraving Co., Mo.Sup., 256 S.W. 2d 805; Hammett v. Nooter Corp., Mo. App., 264 S.W.2d 915.

It is appellants' contention that the evidence conclusively shows that claimant suffered an accident and injury on August 16, 1950, which resulted in the aggravation of a latent diabetic condition and necessitated claimant's hospitalization and the amputation of his right leg. Respondent takes the position that there was ample evidence to justify a finding that no such accident occurred, or, if it did occur, there was no showing that said accident was a causative factor in the loss of claimant's leg.

█ After reviewing the evidence and duly considering the referee's finding, it is our conclusion that no basis exists for disturbing the finding of the commission. While it is true that claimant offered sufficient evidence which, if believed by the commission, would have authorized a finding that claimant did sustain an accident on August 16, 1950, in the manner disclosed by his testimony, there was ample evidence from which a contrary finding could reasonably have been made. Under such circumstances the commission was not required to accept claimant's testimony as true. Michler v. Krey Packing Co., 363 Mo. 707, 253 S.W.2d 136.

█ We have the testimony of Dr. Francis E. Sultzman to the effect that, accord-

ing to his record, claimant at the time he consulted him gave a history of having injured himself at home some three weeks previously when he struck his leg against the side of a car. The doctor had no record, nor did he have any independent recollection, of claimant ever having stated that he had had an accident at his place of employment. It is also significant that claimant failed to mention the alleged accident to the man who relieved him the morning of August 16th, or to the person he relieved the following night. Claimant admitted he said nothing to his superior or to anyone connected with the plant about having injured himself while at work until September 1st when he reported the accident to Mr. Watson. Claimant's testimony has many other inherent weaknesses which are readily apparent from a reading of the transcript, while the testimony of Dr. Sultzman is very persuasive. After considering the latter's testimony and that given by others, together with the admissions made by claimant during the trial, we are convinced that the commission could have reasonably found that claimant did not sustain an accident at the time and place in question.

There is another reason why the award of the commission should stand. Claimant wholly failed to prove any causal connection between the alleged accident and the loss of his leg. Claimant testified that when he slipped and fell he received an injury to his right leg about two inches above the ankle. It caused considerable discomfort at the time but was not severe enough to cause claimant to cease his regular work. Four days later claimant developed a severe pain in the calf of his right leg, with evidence of a thrombosis behind the right knee. He was hospitalized immediately. On September 7th there was a recurrence of pain, and on September 8th pain developed in the third and fourth toe, of the right foot. On September 15th gangrene developed in the toes of the right foot, and on that date claimant's right leg was amputated.

It is clear from the evidence that it was the thrombosis and gangrene which made the operation necessary, but whether the

thrombosis and gangrene resulted from trauma complicated by claimant's diabetic condition, or resulted from diabetes alone, is left to speculation and conjecture. No layman could know or find from the evidence any reasonable basis for an inference as to the cause of said condition.

Dr. Sultzman was the only medical witness. According to his testimony an injury such as testified to by claimant would not aggravate a diabetic condition. He did say, however, that diabetes would make an injury more difficult to treat, but did not go so far as to say that the condition which necessitated the amputation of claimant's leg was in his opinion caused or contributed to by trauma. Without such testimony no case was made under the Compensation Act. The commission could not without expert testimony get at the cause from the other evidence without resort to speculation.

From what we have said, it follows that the judgment of the circuit court affirming the award of the commission should be affirmed by this court, and it is so ordered.

MATTHES, J., and SAM C. BLAIR, Special Judge, concur.